NOT DESIGNATED FOR PUBLICATION

No.118,660

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Adoption of H.I.N.

MEMORANDUM OPINION

Appeal from Saline District Court; PAUL J. HICKMAN, judge. Opinion filed August 10, 2018. Affirmed.

*Jennifer L. Wyatt* and *Angela M. Davidson*, of Wyatt & Davidson, LLC, of Salina, for appellant.

*Bobby J. Hiebert, Jr.,* of Law Office of Bobby Hiebert, Jr., LLC, of Salina, for appellee.

Before MCANANY, P.J., PIERRON, J., and WALKER, S.J.

PER CURIAM: The district court terminated the parental rights of H.I.N.'s natural father and granted Stepfather's petition for adoption. Father appeals. We affirm.

H.I.N. was born in Utah on May 8, 2012. Father and Mother were never married to each other. Father maintained contact with and had a relationship with H.I.N. until his arrest in October 2014. After his arrest, Father maintained contact with H.I.N. by telephone by calling his mother (Grandmother) because Mother and H.I.N. lived with her. However, because H.I.N. was only two years old, the phone calls were brief.

Following his conviction for two counts of sexual assault, the Utah court sentenced Father to two consecutive indeterminate sentences of 1 to 15 years of incarceration. Father contends that the board of pardons informed him he would be released from prison following his seven-year rehearing in December 2024 if he

1

completes the sex offender treatment program. His maximum sentence does not expire until 2044.

In mid-2015, Mother and H.I.N. moved from Utah to Dodge City. Shortly thereafter, Mother and H.I.N. moved to Saline County and Mother married Stepfather. The district court found Stepfather had since taken care of H.I.N.'s daily needs, taken her to the doctor, and provided for her medical needs. The court found that H.I.N. had interacted with Stepfather's family. He testified H.I.N. had stayed with his family in Maine while he and Mother went on vacation. They had spent a month and a half in Maine around December 2016. Additionally, H.I.N. recognized Stepfather as her father. Mother had shown H.I.N. pictures of Father, but she did not recognize him as her father.

Father had no contact with Mother or H.I.N. after they moved to Kansas. Mother testified she had not provided Father with their current contact information, but he was aware they had moved to Kansas. Stepfather testified that about one and a half years before the trial, Mother had taken H.I.N. to Utah and they saw Father's parents. They had not had contact since. The district court found that Grandmother had contact with both Father and Mother and could have provided Father with Mother's contact information. Father claimed he had asked Grandmother to contact Mother through social media but she was unable because Mother had blocked her. Mother denied blocking Grandmother from contacting her.

The district court noted that Father could have contacted friends to get in contact with Mother, but he had failed to make any effort to obtain her contact information. Additionally, Father had the contact information for Stepfather's counsel since July 2016 when Stepfather originally filed the petition. Even so, Father never sought to obtain contact with Mother through counsel. The court considered the phone contacts between Father and H.I.N. as incidental contacts in determining that Father had not had contact with H.I.N. for more than two years before Stepfather filed the petition for adoption. The

2

court noted that Father's participation in H.I.N.'s life over the next seven years would be restricted to phone calls.

The district court also found Father had not provided financial support for H.I.N. in the two years before Stepfather filed for adoption. Mother reported that before his incarceration, Father had offered to provide financial support but never followed through.

Throughout his incarceration, Father had worked for Utah Correctional Industries (UCI), earning $1.00 per hour. He estimated his monthly income was between $100 and $150. Father proposed that he could set up payments through the Utah Office of Recovery Services or send money orders directly to Mother. Although Father proposed different methods through which he could have provided financially, his statements of contribution were prospective, and he never took any steps to follow through. The court found that Father had made six child support payments in the two-year period preceding the amended petition. He even paid an additional amount to apply to arrears.

Interestingly, the district court stated several times that no child support order had been in effect and the record contains no further information about the six payments or the arrears. Although Stepfather and the court seem adamant that there was no prior custody or child support order from Utah, that point seems somewhat unclear. Stepfather denies being aware of any other order that could affect this case, and the court stated multiple times in its findings that no previous order exists. However, during closing arguments, Father mentioned a temporary custody order that the State of Utah filed, and the court found that Father had made six child support payments in the two years preceding the amended petition and he paid an additional amount that went to arrears. "Child support payments" and "arrears" generally mean there was some order in place.

Ultimately, the district court found that Father had failed to assume parental duties for the two consecutive years preceding Stepfather's adoption petition and that

3

termination of Father's parental rights was in H.I.N.'s best interests. The court considered Stepfather to be a stable and respected person who had provided love and affection to H.I.N. It noted that Stepfather had been with H.I.N. for at least two years and had assumed the duties of a father for her. The district court also noted that Father would remain incarcerated until at least 2024, at which point H.I.N. would be 12 years old. Upon release, Father would be a registered sex offender for at least 10 years. The court considered the time remaining in Father's sentence, H.I.N.'s age, and Father's registration requirement in determining that he would not be able to provide for H.I.N.'s needs in the foreseeable future.

The district court granted Stepfather's petition to terminate Father's parental rights, granting Stepfather's adoption of H.I.N. Father appeals.

When a district court terminates parental rights based on factual findings made under K.S.A. 2017 Supp. 59-2136(h)(1), we review those factual findings to determine if, after reviewing all the evidence in the light most favorable to the prevailing party, the findings were supported by clear and convincing evidence. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010). Clear and convincing evidence is evidence "sufficient to establish that the truth of the facts asserted is 'highly probable.'" *In re B.D.-Y.*, 286 Kan. 686, 696, 187 P.3d 594 (2008). When determining whether factual findings are supported by clear and convincing evidence, an appellate court does not weigh conflicting evidence, pass on the witnesses' credibility, or redetermine questions of fact. *B.B.M.*, 290 Kan. at 244.

Courts are to strictly interpret adoptive statutes in favor of maintaining the rights of the natural parents where the statute is being used to terminate the right of the natural parent without consent. *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430, 242 P.3d 1168 (2010). The party seeking to terminate a parent's rights has the burden of proving by

4

clear and convincing evidence that termination is appropriate under K.S.A. 2017 Supp. 59-2136. 291 Kan. at 430.

When a nonconsenting parent is unable to fulfill the usual parental duties due to incarceration, the district court must decide whether the parent has sought the opportunities and options that could be available to perform those duties to the best of his or her abilities. *In re Adoption of S.E.B.*, 257 Kan. 266, 273, 891 P.2d 440 (1995). If an incarcerated parent has made reasonable efforts to contact and maintain a continuing relationship with his or her children, it is up to the district court to determine whether such efforts are sufficient. *In re Adoption of F.A.R.*, 242 Kan. 231, 236, 747 P.2d 145 (1987).

The district court terminated Father's parental rights pursuant to K.S.A. 2017 Supp. 59-2136(h)(1)(G), under which the court may terminate parental rights of a father if, upon a showing by clear and convincing evidence, it determines the father has failed or refused to assume parental duties for two consecutive years before the petition was filed.

Father contends the district court's findings are unsupported by substantial competent evidence. He asserts that his offer to provide financial support was sufficient to be considered a reasonable effort to assume his parental duties. He claims the court improperly discounted his offer to set up support payments through the Utah Office of Recovery Services as insufficient even though he did not have Mother's address to provide for payment. He also claims the court should not penalize him for Mother interfering with his fundamental right to maintain contact with H.I.N. by moving and not providing him with contact information.

Father contends his offer of financial support was sufficient to comprise reasonable efforts and the district court should not have disregarded his offer as

5

incidental. He cites to *Baby Girl P.*, in which the Kansas Supreme Court determined that the Court of Appeals had erred by finding the father's offer to provide anything the custodial parents needed was insufficient because it was all-encompassing and not reasonable. 291 Kan. at 434. In determining that the offer was not merely incidental parental activity, the Supreme Court found that the father had retained counsel, filed for visitation rights, provided gifts, and offered to provide anything needed to support his daughter. 291 Kan. at 434. In *Baby Girl P.*, the offer alone was not necessarily sufficient to show the father was committed to assuming the role of a father, but the court considered his actions in addition to his offer to determine his attempts were more than incidental parental activities. 291 Kan. at 434.

Here, the district court found that Father had contributed nothing financially since October 2014 and that he stated he could have provided financial support but did not. Mother testified that before his incarceration, Father promised financial assistance but failed to follow through. This court has determined that it is proper for district courts to consider events outside the two-year period before the filing of the petition when a natural parent has been incarcerated all or much of the two years when determining whether the parent made sufficient efforts to maintain a close relationship with the child. *In re Adoption of S.J.R.*, 37 Kan. App. 2d 28, 43, 149 P.3d 12 (2006) (quoting *Matter of Adoption of A.J.P.*, 24 Kan. App. 2d 891, Syl. ¶ 2, 953 P.2d 1387 [1998]). Father did not dispute Mother's assertion that he did not provide financially before his incarceration. "Uncontradicted evidence which is not improbable or unreasonable is ordinarily regarded as conclusive and cannot be disregarded unless it is shown to be untrustworthy." *Matter of Adoption of W.J.*, 262 Kan. 788, Syl. ¶ 1, 942 P.2d 37 (1997). Mother's statement shows that even when he had contact with H.I.N., he failed to contribute financially, thus supporting the district court's determination that Father presented only prospective plans for contributing financial support while failing to follow through.

Father asserts the district court did not sufficiently consider Mother's unilateral move to Kansas without providing him with her new contact information. He contends the court should have considered her actions as interference with his fundamental right to maintain contact with his child. Father claims the court should have considered Mother's moving without giving him contact information as a significant factor in considering all the surrounding circumstances. He noted that knowing she moved to Kansas did not provide him with an ability to contact her. He acknowledged his incarceration was his fault, but states that his incarceration should not have been the end of a relationship with H.I.N.

Father supports his argument by citing *F.A.R.*, in which the stepfather filed to adopt the children of an incarcerated father. In *F.A.R.*, the district court found that the mother who refused to allow the children to visit the father had interfered with his rights to maintain contact with his sons. While incarcerated, the father moved for and was awarded visitation rights with his sons. The mother's refusal was contrary to the court's visitation order. Even so, the *F.A.R.* court found that the mother's interference was merely one of the circumstances considered, not a principal factor, in the district court's determination that the father's consent was required for the stepparent adoption. 242 Kan. at 237. In determining the father assumed his parental duties, the court weighed the actions taken by father to try to regain contact with his children without contact from the mother. 242 Kan. at 238-40.

Here, the district court considered Mother's testimony that she had not provided Father with current contact information. Father testified that he asked Grandmother to contact Mother but he believed Mother had blocked Grandmother from contacting her. Mother testified she had not blocked Grandmother. The court acknowledged that Mother did not help Father maintain a relationship with H.I.N., but narrowed its focus to whether he failed to assume his parental duties in finding he made no efforts to maintain a relationship. Although Father testified he had asked Grandmother to contact Mother, the

7

court found Mother's testimony credible when she stated that Grandmother had not contacted her despite the ability to do so through social media. The court also noted that Father could have tried to obtain contact information from unnamed third parties, such as Mother's family or mutual acquaintances. Both Mother and Stepfather testified that Father had not sought to contact or provided for H.I.N. Father did not controvert their testimony. Instead, he relied on not having contact information to justify his inaction.

As Stepfather asserts, the test here is action, not hopes of a relationship someday. Natural parents have prevailed when they have actively sought involvement in their children's lives. The *F.A.R.* court found the father had assumed parental duties when his family corroborated his statements that he tried to contact his children through his relatives, he had written letters to the children's mother, he had sought legal advice to enforce visitation rights, and he had mailed money to the mother. 242 Kan. at 239. In *Baby Girl P.*, the father's efforts were reasonable when he retained counsel, filed court actions to obtain visitation, gave gifts for his daughter, and offered to provide for any needs his daughter had. 291 Kan. at 434. Here, the only attempt Father reportedly made to regain contact with H.I.N. was when he asked Grandmother to contact Mother. But unlike in *F.A.R.*, Grandmother did not corroborate his assertion, and Mother countered the assertion by testifying that Grandmother had never contacted her. The court pointed out that Stepfather originally filed the case in July 2016. Father had contact information for Stepfather's attorney and could have used that as a way to contact H.I.N. His failure to act when given an opportunity further supports the court's determination that he failed to assume his parental duties. Father's inaction was supported by sufficient competent evidence.

The district court found it was in H.I.N.'s best interests to remain placed with Mother and Stepfather and that Stepfather was a stable, respected person who has shown H.I.N. love and affection. The court noted that Stepfather has been in her life for at least two of her five years of life and has taken on the responsibilities of a father. To the

8

contrary, Father will remain incarcerated until at least 2024 and will register as a sex offender for at least ten years upon release. The court determined Father would be unable to provide for H.I.N.'s needs for the foreseeable future and that despite claims that he wants to be involved in her life, he has failed to demonstrate that.

Under K.S.A. 2017 Supp. 59-2136(h)(2)(A), the court may consider the best interests of a child as a factor when determining whether parental rights should be terminated. The best interests of the child are not a controlling factor when determining whether a natural parent failed to assume parental duties. *F.A.R.*, 242 Kan. at 235. The court's factual findings under K.S.A. 2017 Supp. 59-2136(h)(1), including the K.S.A. 2017 Supp. 59-2136(h)(2) findings, are reviewed in the light most favorable to the prevailing party to determine whether they are supported by clear and convincing evidence. *B.B.M.*, 290 Kan. at 244. Clear and convincing evidence is evidence "sufficient to establish that the truth of the facts asserted is 'highly probable.'" *In re B.D.-Y.*, 286 Kan. 686, 696, 187 P.3d 594 (2008).

Under the best interests of a child standard, courts determine which custody arrangements would be to the child's greatest benefit. Black's Law Dictionary 191 (10th ed. 2014). A court may consider many factors, including: the emotional bond between the child and a parent or guardian; the ability of the parent or guardian to give the child love and guidance; the ability of the parent or guardian to provide necessities; the child's established living arrangements; the child's preference if the child is old enough for the court to consider such preference; and a parent's ability to foster a healthy relationship with the child and other parent. Black's Law Dictionary 191 (10th ed. 2014). Here, under K.S.A. 2017 Supp. 59-2136(h)(2), the district court did not have to make findings about the child's best interests in terminating Father's parental rights as the court had already made sufficient findings that Father had failed or refused to assume the duties of a parent for two consecutive years under K.S.A. 2017 Supp. 59-2136(h)(1).

9

Father contends the district court's finding that Stepfather was a stable, respected person who had provided love and affection for H.I.N. was unsupported by evidence. Instead, he asserts the evidence showed that Stepfather was unstable because of his disability based on anxiety and depression. He also contends instability based on the quick progression of Mother and Stepfather's relationship and the potential move to Rush County.

Stepfather testified he had received social security since 2010 for disability based on anxiety and depression. He had taken medication for anxiety for approximately 24 years and learned many coping mechanisms in that time. His anxiety caused him to struggle in large areas. Since being on disability, Stepfather had gone back to college and was working on his master's degree in Instructional Technology at Fort Hays State University online. For future employment, he had completed a background check to allow him to go into schools and work with teachers in updating technology. Even while receiving disability benefits, Stepfather has taken care of household expenses since Mother and H.I.N. had lived with him.

As to the possible move to Rush County, Stepfather stated he and Mother had purchased a home there because it was less expensive and closer to Fort Hays. They had been working on the house and planned to move there once the house was in livable condition. In addition, he believes living in the small community will help him to more easily take part in school functions and be a better support for H.I.N.

The evidence supports the district court's findings that Stepfather is stable. While he receives social security for his disability, he has furthered his education in an attempt to reenter the workforce in a different capacity. Even while on disability, he had provided financially for Mother and H.I.N. for at least two years. No evidence contradicted his ability to provide financially or demonstrated any instability that could prevent Stepfather from adequately caring for H.I.N.

Father contested the significance the district court placed on its finding that Stepfather had been with H.I.N. for two years because Father also spent two years with her. Importantly, the court pointed out the two years Stepfather had spent with H.I.N. were the most recent years of her life. The court also found that in those two years Stepfather had taken on the responsibilities of a parent and showed a commitment to be involved in H.I.N.'s life. The court found that Stepfather ensured H.I.N.'s daily needs were met, took her to the doctor, and gave her medication as prescribed. Conversely, the court found that despite Father's claims that he wanted to be involved in her life, he had failed to show it. In this analysis, the importance is not necessarily just the amount of time but also the relationship established and the parental responsibilities assumed. The district court did not fail to consider Father's two years spent with H.I.N., but made findings of fact that support the significance of the two years Stepfather spent with her.

Father contends the district court found that he would be unable to provide for H.I.N.'s needs because he will have to register as a sex offender for 10 years after his release from prison. The district court held:

> "[Father] won't be available to care for [H.I.N.'s] needs for at least seven (7) years as 2024 is his earliest release date. If [Father] were actually released when [H.I.N.] is approximately twelve (12) years of age he will be a registered sex offender for at least ten (10) years due to his conviction. He will be unable to provide for [H.I.N.'s] needs for the foreseeable future."

Father claims no evidence showed that his registration would prohibit him from gainful employment and that the court did not balance his potential difficulty finding employment with Stepfather's unemployment for disability.

Although Stepfather was unemployed, he received social security which allowed him to provide financially for H.I.N.'s needs. In that time, he furthered his education to improve his ability to reenter the workforce in a new capacity.

Additionally, while no evidence showed Father might not find gainful employment while registering as a sex offender, the district court found that he would be unable to provide for H.I.N.'s needs for the foreseeable future. Father asserts the board of pardons will release him in 2024, but he could be incarcerated until 2044. When considering the "foreseeable future," courts observe from the child's perspective, not the parent's perspective. *In re R.S.*, 50 Kan. App. 2d 1105, 1117, 336 P.3d 903 (2014). With regard to incarcerated parents, this court has found that as few as seven months of additional incarceration time, when considered with other factors, was sufficient to establish the parent's condition would not change in the foreseeable future. *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009) (citing *In re M.B.*, 39 Kan. App. 2d 31, 47-48, 176 P.3d 977 [2008]). In *S.D.*, the court determined that 11 more months of incarceration, which would have resulted in S.D. being in out-of-home placement for half of her life, when considered with other factors, was sufficient to establish the parent's condition was unlikely to change in the foreseeable future. Here, with a minimum of seven years remaining, the uncertainty of his release date, and the additional factors addressed above, the district court did not err by determining Father will be unable to provide for H.I.N.'s needs for the foreseeable future.

Affirmed.